IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LINCOLN FRANCHELL and
JOHN DOE 1,
on behalf of themselves and all others
similarly situated,

Plaintiffs,

v.

THE UNITED STATES CONFERENCE
OF CATHOLIC BISHOPS

Defendant.

Case No. 6:19-cv-1006 (DNH/TWD)

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs Lincoln Franchell and John Doe 1, for themselves and the thousands of other people who were sexually abused as children by the priests of the Roman Catholic Church in New York because of the failures of Defendant United States Conference of Catholic Bishops, and for their Complaint for Damages and Class relief state the following.

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................................. 3

JURISDICTION AND VENUE ...................................................................................................... 4

PARTIES   ......................................................................................................................................... 4

FACTS COMMON TO ALL COUNTS ......................................................................................... 6

    Background and History of The USCCB ...................................................................................... 6

    Children Endure Abuse while The USCCB Sits Idly By ............................................................. 9

    The USCCB Fails to Use its Unencumbered Resources to Come to the Aid of Children ............. 11

    2002: *Spotlight* shines bright and The USCCB rushes to do damage control ............................... 12

    The Church Ignored Sexual Abuse for Decades and
Continue to Put Parishioners in Harm's Way ........................................................................... 15

    Settlement Program: A Last-Ditch Effort By The Church To Thwart Victims ............................ 16

CLASS ACTION ALLEGATIONS ............................................................................................... 18

CAUSES OF ACTION .................................................................................................................. 20

DEMAND FOR JURY TRIAL ..................................................................................................... 25

PRAYER FOR RELIEF ................................................................................................................ 25

## I.    INTRODUCTION

"It's an assembly of bishops that carries out certain pastoral functions on behalf of the faithful of their region — **things that only can be accomplished on a national level, they can't just be accomplished on a regional or local level**."[1]

—Monsignor Brian Bransfield, general secretary of the United States Conference of Catholic Bishops, on the duty owed by The USCCB

This Complaint arises from the severe and long-term pattern of organized sexual abuse of thousands of adolescent children by their priests. Using religion as both a source of power and a pretext for their sins, these priests preyed on young boys and girls in ways that are difficult to fathom. Since at least the 1940s, if not earlier, until the present day, priests have been given free reign to abuse and exploit children. Since its inception in 1966,[2] the ultimate authoritative body within the Catholic Church in our country, The United States Conference of Catholic Bishops ["The USCCB"], has had knowledge of clergy abuse, of its duty to act to protect innocent children and its ability to do so. Yet it failed to implement any policy or procedure for halting sex abuse until 2002.

Worse yet, once these policies were actually enacted, The USCCB did nothing to ensure the policies were enforced or followed. This recklessness directly caused thousands of children to suffer at the hands of pedophile priests. These bad actor priests could never have evaded detection if they were not harbored, protected, and facilitated by The USCCB, which allowed them to be shuffled them around to make sure that money and power flowed into the Church and

---

[1] *Q&A with Msgr. J. Brian Bransfield, general secretary of The USCCB*, The Dialog (July 21, 2019) http://thedialog.org/catechetical-corner/qa-with-msgr-j-brian-bransfield-general-secretary-of-the-usccb/

[2] USCCB Timeline 1917-2017, http://www.usccb.org/about/usccb-timeline-1917-2017.cfm (last visited August 11, 2019)

unsuspecting families were left vulnerable to abuse. The precious reputation of the Conference comprised of sanctimonious Bishops was more important than the protection of the innocent victims.

## II.     JURISDICTION AND VENUE

1.     This is a civil action seeking relief and damages under New York tort law. Federal jurisdiction is proper under the Class Action Fairness Act, 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000, minimal diversity of citizenship exists between the plaintiffs and the defendant, and the proposed class is comprised of more than one hundred members.

2.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391.

3.     This case is brought pursuant to the Child Victims Act, NY LEGIS 11 (2019), 2019 Sess. Law News of N.Y. Ch. 11 (S. 2440), enacted on February 14, 2019, which created a one-year lookback period for victims such as Lincoln and John Doe 1 to litigate claims arising from sexual abuse that would otherwise be time-barred by the statute of limitations, starting six-months from the signing of the bill, on August 14, 2019.

## III.     PARTIES

4.     Plaintiff Lincoln Franchell is a natural person, a United States citizen, and a resident of New York. Beginning in the mid-1970s, when Plaintiff was just 13 years old, he was sexually abused multiple times by Monsignor H. Charles Sewall, a Catholic High School Principal in Syracuse, New York. After Lincoln was reprimanded for skateboarding outside of Utica Catholic Academy, he was sent to the principal's office for punishment. This is where Sewall used is authority and position of power to exploit and sexually abuse Lincoln. Over the course of several years, Sewall raped, sodomized and otherwise tortured Lincoln. The USCCB

knew (or should have known) that Sewall, who they employed, commanded, supervised, directed, and/or controlled, was guilty of child sex abuse—yet they did not prevent him from engaging in child sex abuse, or punish him for engaging in child sex abuse, but rather, engaged in a concerted action to cover-up his repeated sexual abuse of children. In 1988, Lincoln was offered a minimal monetary settlement by the Diocese only after Sewall admitted to the sexual abuse in an audio-recording. As part of the settlement terms, Sewall was to be banned from teaching in schools or saying mass—yet, in another broken promise by the Church, Sewall wasn't actually removed from ministry until 2003.

5.      John Doe 1 is a natural person, a United States citizen, and a resident of New York. Beginning in 1972, when Plaintiff John Doe 1 was just 15 years old, he was groomed, molested, and sexually abused by Deacon-turned-Priest Dan Casey of the Diocese of Syracuse. John Doe 1 admitted to being "enthralled" with Casey, and Casey exploited this trust and preyed on John Doe 1's innocence and naivete. Over the course of several years, Casey repeatedly sexually exploited and molested John Doe 1, inflicting deep emotional trauma. The incidents of abuse occurred at various locations around New York, including in multiple church rectories, two different YMCA facilities, and even at John Doe 1's childhood home. The USCCB knew (or should have known) that Casey, who they employed, commanded, supervised, directed, and/or controlled, was guilty of child sex abuse—yet they did not prevent him from engaging in child sex abuse, or punish him for engaging in child sex abuse, but rather, engaged in a concerted action to cover-up his sexual abuse of children. In the years following the abuse, Casey stalked and harassed John Doe 1, even showing up at the home he lived in with his wife in the early 1990s. It wasn't until 1993, after John Doe 1 sought professional therapy and counseling that he was able to recognize the trauma of the abuse. In 2018, John Doe received monetary

compensation through the Archdiocese of New York Independent Reconciliation and Compensation Program.

6.    The putative class is comprised of the thousands of victims who were sexually abused by Catholic clergy in the state of New York and who previously received monetary compensation in exchange for their release of claims against the Archdiocese of New York, any Dioceses within New York, and/or individuals within the Diocese.

7.    Defendant The United States Conference of Catholic Bishops ["The USCCB"] is a domestic nonprofit corporation that may be served through its Registered Agent, Ronny Edward Jenkins, at 3211 Fourth Street NE, Washington D.C. 20017.

## IV.    FACTS

**Background and History of The USCCB**

8.    Defendant USCCB is the episcopal conference and legislative body of the Catholic Church. Defendant USCCB directly supervises, directs, and/or controls Catholic Clergy in the United States through its internal legislative and governing power, as prescribed in Canon Law. The USCCB is comprised of bishops from across the country.

9.    Founded in 1966 as the joint National Conference of Catholic Bishops and the United States Catholic Conference, Defendant USCCB is composed of all active and retired members of the Catholic hierarchy. Defendant USCCB adopted its current name in July 2001.

10.    The USCCB is an entity and governing body separate and distinct from any Archdiocese or Diocese within the Catholic Church.

11.    The 1983 Code of Canon Law establishes three levels of church laws and regulations for the Catholic Church. The first level is universal law, which is enacted by the pope and operative throughout the world. The second level is national law enacted by Defendant

USCCB. The third level is diocesan law enacted by a diocesan bishop and operative in the bishop's diocese. Diocesan bishops, however, are prohibited from enacting legislation that conflicts with national law promulgated by Defendant USCCB. The USCCB is the ultimate Catholic authority within the U.S.

12.    Defendant USCCB also oversees, governs, supervises, and directs all Catholic dioceses and parishes in the United States. Defendant USCCB is empowered by church law to legislate for United States dioceses on many issues and, in fact, the 1983 Code of Canon Law contains many areas specifically left to Defendant USCCB to decide. On an ongoing basis, Defendant USCCB studies and votes on issues which can bind all United States dioceses. Defendant USCCB has the power to make policy decisions, the power to legislate, and the power and resources to provide information, direction and supervision of dioceses, parishes, and their Clergy. Defendant USCCB officers and representatives have frequently represented themselves as acting on behalf of the entire community of the Catholic Church, including Catholic children.

13.    By its own admission, the buck stops with The USCCB, and it is the highest authority of the Catholic Church within the United States.

a.    The highest order of ordained ministry in Catholic teaching is that of bishop.[3]

b.    The United States Conference of Catholic Bishops (USCCB) is an assembly of the hierarchy of the United States and the U.S. Virgin Islands who jointly exercise certain pastoral functions on behalf of the Christian faithful of the United States.[4]

---

[3] USCCB About Us, Leadership, Bishops and Eparchs, http://www.usccb.org/about/leadership/bishops-and-eparchs.cfm (last visited August 8, 2019)

[4] About USCCB, http://www.usccb.org/about/ (last visited August 12, 2019)

c. Bishops' Conference: A national (or, in a very few cases, regional) body of bishops that meets periodically to collaborate on matters of common concern in their country or region.[5]

14. The USCCB also has assumed responsibility for studying numerous issues impacting the day-to-day life of Catholics in each diocese in the country. Over the years, The USCCB has created policies and procedures and conducted studies in a variety of areas impacting dioceses and their Clergy throughout the United States. Defendant USCCB has sought to influence U.S. public policy and/or state governments in areas over which it has authority— including various legislation concerning education and children's rights (excluding, ironically, the sexual abuse of children).

15. Since The USCCB has sought to influence public policy in numerous areas directly related to church matters, and in keeping with Catholic theology and canon law, it has a direct interest in the moral issues related to the welfare of children— including the duties to safeguard and protect them from Clergy child sex abuse, report abusive Clergy to law enforcement, maintain transparency regarding abusive Clergy, and compensate Clergy child sex abuse victims—including Plaintiffs and Class Members—for their injuries and harm. And, in fact, throughout the years, The USCCB has maintained several committees pertaining to the welfare of children, including the Domestic Social Policy Committee, International Policy Committee, and Marriage and Family Life Committee. These committees have published major studies focusing on children and the family, including, without limitation, A Family Perspective in Church and Society, Manual for all Pastoral Leaders (1988), Putting Children and Families

---

[5] Glossary of Catholic Terms, http://www.usccb.org/about/public-affairs/glossary/index.cfm (last visited August 11, 2019)

First, a Challenge For Our Church, Nation, and World (1991) (see section on Abuse and Neglect at 9), and a Plan of Pastoral Action for Family Ministry (1978).

16.    The Catholic Church has traditionally advocated the obligations of the secular State towards the individual and common good. It has, as an international and national entity, assumed the right to speak out on various public issues, which it claims are grounded in religious teaching and impact civic culture. On the national level, The USCCB has invoked this claim in its efforts to influence public policy in numerous areas, including those directly related to sexual morality—such as abortion, sterilization, and the distribution of contraceptives. Clergy child sex abuse is a felony crime and an ecclesiastical crime. While The USCCB has taken proactive stances on issues of sexual morality, it, ironically, has failed and refused to be proactive about safeguarding and protecting children from clergy child sex abuse and reporting abusive clergy to law enforcement.

**Children Endure Abuse while The USCCB Sits Idly By**

17.    As Catholic scholar and Certified Clinical Mental Health Counselor Richard Sipe so aptly put it: "In the Catholic church, sexual corruption is conferred from the top down – from men in power."[6]

18.    Despite The USCCB's great authority and influence in the Church, especially in the second largest Archdiocese in the U.S., the Archdiocese of New York, which currently touts 7.3 million Catholics[7], The USCCB failed to act to stop sexual abuse by clergy.

---

[6] Richard Sipe, *View from the Eye of the Storm* Keynote Address at Linkup National Conference, *(February 23, 2003),* http://www.awrsipe.com/Lectures/2003-02-23-linkup.htm (last visited August 8, 2019)

[7] *New York's Catholic Church—How We Serve*, New York State Catholic Conference, https://www.nyscatholic.org/what-is-the-new-york-state-catholic-conference/new-yorks-catholic-church-how-we-serve/ (last visited August 11, 2019)

19.    The USCCB's unyielding power—submissive only to the Holy See—vested The USCCB with the ability to change the culture of the Church and to stop the threat of child abuse of young Catholic children.

20.    The USCCB made no effort to address prominent abuse by clergy until 2002, nearly 40 years after its inception.

21.    Within New York state alone, thousands of young children fell victim to clergy abuse under the USCCB's watch, despite that such abuse was a well-known secret amongst Bishops and Church officials. Instead of interjecting and reporting predatory priests to law enforcements, the Dioceses and Archdiocese, in the absence of direction or policies from The USCCB, simply moved priests to other parishes, leaving unknowing families susceptible to their abuse.

22.    For example, and as relevant to this litigation, the Diocese of Syracuse became a warehouse for priests who were the subject of credible reports of sexual abuse in another diocese..

23.    Instead of taking punitive measures to stop abuse, the Church moved priests from dioceses which oversaw large Catholic Universities and valuable real estate (like Montreal, Baltimore, Philadelphia, New York City, and Brooklyn) to dioceses where the Church did not possess such valuable assets. One of those dioceses was The Diocese of Syracuse.

24.     Instead of taking accountability for these clergy and reporting child-molesting priests to law enforcement, The USCCB took steps to ignore, conceal and deny for the abuse or its role in facilitating it, now pointing to their less-than-heroic efforts in drafting toothless policies regarding sexual abuse by clergy in 2002.

**The USCCB Fails to Use its Unencumbered Resources to Come to the Aid of Children**

25.    From 1966 when The USCCB commenced to 2002 and today, money flowed from parishes across the country to The USCCB.

26.    The amount of money generated and donated by the parishioners of the Archdiocese of New York since 1966 is an incredible sum, well into the hundreds of millions of dollars. A portion of this money is allocated to fund The USCCB.

27.    This tax-exempt organization grows wealthier by the year, as trusting Catholics fork over their hard-earned cash and The USCCB takes its share of the collection proceeds.

28.    In 2018, The USCCB had over $365 million in assets on its balance sheet and described the principal activities of its Current Operating Fund to be "pastoral activities, management and general activities, communications, and policy and advocacy."[8]

29.    Money derived from parishioners' tithing and donations funded The USCCB and established the direct relationship between members of the Church and The USCCB. Catholics reasonably believed their money was benefitting the Church, the parishes and their families— and used for equitable purposes such as funding the Conference of Catholic Bishops. Catholics trusted that The USCCB would act in their best interest and work tirelessly to protect children in the Church from the unreasonable risk of harm of sexual abuse.

30.    Parishioners' unwavering trust and confidence in the higher-ups in the Church was misplaced, as The USCCB repeatedly, year after year, failed to implement any meaningful policy or procedure against sexual abuse by clergy. By taking their money to fund the work of

---

[8] United States Conference of Catholic Bishops and Affiliates Financial Statements, KPMG Audit (December 31, 2018) http://www.usccb.org/about/financial-reporting/upload/financial-statements-2017-2018.pdf (last visited August 13, 2019)

The USCCB, the Conference created the duty of care to Catholic families to protect them and act in their best interest.

**2002: *Spotlight* shines bright and The USCCB rushes to do damage control**

31.    In January 2002, the Boston Globe published its now famous exposé outlining rampant sexual abuse in the Catholic Church and highlighting the Church's failures in addressing the abuse and taking measures against predator priests.[9]

32.    After years of intentionally turning a blind eye to the abuse rampant throughout the Church, The USCCB convened to draft the first set of regulations regarding sexual abuse by clergy.

33.    What the dedicated journalists at the Boston Globe were able to uncover was previously so insignificant to the very group of individuals entrusted to oversee the Catholic Church in the United States that they had not ever addressed it.

34.    In Dallas, in June of 2002, The USCCB tardily drafted a landmark document in response to the crisis of sexual abuse of children in the Church. This document, setting forth their agreed upon responsibilities in combating the problem, was entitled the *Charter for the Protection of Children and Young People*.[10]

35.    The *Charter* is a comprehensive set of procedures, established by The USCCB and adhered to when addressing allegations of sexual abuse of minors by Catholic clergy.

---

[9] See Michael Rezendes, *Church allowed abuse by priest for years*, The Boston Globe (January 6, 2002) https://www.bostonglobe.com/news/special-reports/2002/01/06/church-allowed-abuse-priest-for-years/cSHfGkTIrAT25qKGvBuDNM/story.html (last visited August 13, 2019)

[10] http://www.usccb.org/about/child-and-youth-protection/who-we-are.cfm (last visited January 31, 2019).

Comprised of 18 Articles, it also includes guidelines for reconciliation, healing, accountability, and prevention/education to prevent future acts of abuse."[11]

36.     The Preamble to the *Charter* includes these statements:

Since 2002, the Church in the United States has experienced a crisis without precedent in our times. The sexual abuse of children and young people by some deacons, priests, and bishops, and the ways in which these crimes and sins were addressed, have caused enormous pain, anger, and confusion.

* * *

**We continue to have a special care for and a commitment to reaching out to the victims of sexual abuse and their families.** The damage caused by sexual abuse of minors is devastating and long-lasting. We apologize to them for the grave harm that has been inflicted on them, and we offer our help for the future.

(emphasis added)

37.     The first three Articles of the *Charter* appear under the heading: "To Promote Healing and Reconciliation with Victims/Survivors of Sexual Abuse of Minors."

38.     Article 1 of the *Charter* includes this language:

Dioceses/eparchies are to reach out to victims/survivors and their families and demonstrate a sincere commitment to their spiritual and emotional well-being. The first obligation of the Church with regard to the victims is for healing and reconciliation. Each diocese/eparchy is to continue its outreach to every person who has been the victim of sexual abuse as a minor by anyone in church service, whether the abuse was recent or occurred many years in the past.

39.     Article 2 of the *Charter* includes this language: "Dioceses/eparchies are to have a competent person or persons to coordinate assistance for the immediate pastoral care of persons who report having been sexually abused as minors by clergy or other church personnel."

---

[11] *Diocese of Syracuse Child & Youth Protection / Safe Environment Annual Report*, April 2014 http://syracusediocese.org/assets/Uploads/pdfs/2014-10-year-report-FINAL-051414.pdf.    (last visited January 31, 2019).

40.    Articles 4 through 7 of the *Charter* appear under the heading: "To Guarantee an Effective Response to Allegations of Sexual Abuse of Minors."

41.    Article 4 of the *Charter* states:

Dioceses/eparchies are to report an allegation of sexual abuse of a person who is a minor to the public authorities. Dioceses/eparchies are to comply with all applicable civil laws with respect to the reporting of allegations of sexual abuse of minors to civil authorities and cooperate in their investigation in accord with the law of the jurisdiction in question.

Dioceses/eparchies are to cooperate with public authorities about reporting cases even when the person is no longer a minor.

In every instance, dioceses/eparchies are to advise victims of their right to make a report to public authorities and support this right.

42.    On June 17, 2005, The USCCB promulgated a revised version of the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*, which were originally approved as particular law on November 13, 2002.

43.    The *Norms* became law for all Dioceses and Eparchies of The USCCB on May 15, 2006.

44.    *Norm* No. 3 states: "Each diocese/eparchy will designate a competent person to coordinate assistance for the immediate pastoral care of persons who claim to have been sexually abused when they were minors by priests or deacons."

45.    The USCCB drafted these documents to bind the Bishops and the Dioceses and require them to employ effective measures in handling reports of sexual abuse by sexual abuse survivors.

46.    The Charter and Norms were created for the sole and immediate benefit of Plaintiffs and other innocent victims who were subjected to sexual abuse by clergy.

47.     Pursuant to the express language, the intent behind the creation of these documents was for Plaintiffs and all other victims—but the terms were not followed or upheld and The USCCB failed to take punitive measures against Dioceses that failed to abide by these rules.

48.     Tragically, and to the immeasurable detriment of Plaintiffs, the putative class members and hundreds of other victims, The USCCB failed to uphold the unambiguous terms of the Charter, and these rampant failures to help and protect sexual abuse survivors continues today.

49.     Through this lawsuit, Plaintiffs demand that The USCCB acknowledge their failures, account for the damages these failures have caused, and institute real and meaningful change to ensure that no future children endure such abuse.

50.     Until the national news media shined a bright light on the epidemic of abuse within the Catholic Church, the Church nor its authoritative body, The USCCB, failed to exhibit even the slightest regard for the safety of the children; that callous indifference continues to the present day.

**The USCCB Ignored Sexual Abuse for Decades and Continued to Put Parishioners in Harm's Way**

51.     In the face of a clear duty to protect its parishioners, especially innocent children who act as altar servants, The USCCB has engaged in negligence and gross negligence by failing to protect or to investigate the sexual predators' abuse and exploit them.

52.     Despite having tens and often hundreds of millions of dollars at its disposal, The USCCB decided over the last five decades to not pay for any reasonable compliance or security measures to ensure that priests were not sexually abusing young children even though they knew this abuse was occurring.

53.    The USCCB had actual knowledge that sexual abuse is a major problem within the Church but has ignored all warnings and sought to silence those who have worked to stop sexual abuse by priests.

54.    Since at least 2002's Spotlight article, the Church has been under a microscope to investigate and initiate measures that seek to remediate the abuse.

55.    However, instead of seeking to help the parishioners and families, The USCCB continued to allow relocation of predatory priests to Dioceses within New York, leaving children at risk of greater harm of being sexually assaulted.

56.    The tales of sexual abuse of children are too numerous to adequately summarize, but they existed long before the 2002 Charter, and they continue to proliferate even today.

57.    Revelations about the handling of misconduct cases during The USCCB's reign are continually being exposed.

58.    As this lawsuit reveals, the actions taken by The USCCB since sexual abuse by clergy was first reported amounts to nothing more than a sham to protect their own image.

59.    To this day, the names of all abusers protected by The USCCB have yet to be revealed.

60.    This 40-year delay is indefensible, and The USCCB knew or was willfully blind that so many priests presented a clear and present danger to young male and female parishioners.

**Settlement Program: A Last-Ditch Effort By The Church To Thwart Victims**

61.    Years after The USCCB wrote the Charter, in 2016, the Archdiocese of New York state implemented a victim compensation funds for those sexually abused by clergy.

62.    This program, The Independent Reconciliation Compensation Program ["IRCP"] and gave victims the chance to submit claims detailing their abuse to receive monetary

settlements[12] in exchange for releasing all legal claims against "The Roman Catholic Diocese of [], New York and all of its current or former clerics, bishops, priests or deacons, its parishes, schools and institutions, religious corporations, educational corporations, and not-for-profit corporations, all their respective officers, directors, trustees, administrators, agents, employees, successors, assigns, and affiliates, all insurers of the Diocese of [] and all insurers of any other person/entity released herein (jointly and severally, the "Releasees").[13]

63.     However, notably absent from the settlement release was the entity tasked with protecting children within the Church—The USCCB.

64.     The USCCB had the power to ban and punish priests who committed sexual abuse, the financial resources to implement safeguards for innocent children, and the knowledge to make credible reports of misconduct to law enforcement. It simply chose to abandon the safety and security of these children. At the same time, it was burying its head in the sand so it could pretend not to be liable, while dioceses continue to declare bankruptcy to avoid the pecuniary recourse the law provides to victims.

65.     The victims most greatly affected and hurt by The USCCB's actions and inactions were the families and children of the Archdiocese of New York and especially the Diocese of Syracuse—where predatory priests were being dumped at an alarming rate and children were repeatedly being sexually assaulted by priests who had already been reported to the Church.

66.     Clergy who had credibly been found to have sexually abused children continued to say mass, dole out communion, administer Catholic education and even teach in schools.

---

[12] In another show of bad-faith, the Church vastly and intentionally underfunded the settlement program, for example, allowing a maximum amount of $300,000 per victim in the Syracuse Diocese IRCP, despite some having suffered pervasive and horrific sexual abuse.

[13] Exhibit A.

67.     It is time to hold The USCCB accountable.

## V.    CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action individually and pursuant to Federal Rule of Civil

Procedure 23 on behalf of the following Nationwide Classes:

**(b)(3) Damage Class or (c)(4) Issue Class**

All those who (1) attended or served any parish within the Archdiocese of New York and (2) were subjected to sexual abuse, rape, molestation or any sexual misconduct by any priest or clergy within the Archdiocese of New York who perpetuated or committed of any kind of sexual misconduct, (3) as a minor child and (4) previously settled a claim arising from such abuse with the Archdiocese, any Diocese within New York, or received monetary compensation because they submitted a claim facilitated by the Independent Reconciliation and Compensation Fund.

69.     The Class consists of hundreds, if not more, male and female victims residing

throughout the U.S. and possibly abroad, making joinder impracticable, in satisfaction of Fed. R.

Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are fully

knowable and ascertainable through records maintained by the Archdiocese and the IRCP.

70.     The claims of Plaintiffs are typical of the Classes. The claims of Plaintiffs and the

Classes are based on the same legal theories and arise from the same unlawful acts and omissions

of The USCCB.

71.     There are many questions of law and fact common to the claims of Plaintiffs and

the Class, and those questions predominate over any questions that may affect only individual

Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

72.     Common questions of fact or common questions of law affecting members of the

Class include, but are not limited to, the following:

a.   Whether The USCCB had active knowledge of the sexual misconduct by clergy;

b.   Whether The USCCB facilitated the abuse by clergy;

c.  Whether The USCCB did proactively fail to act to diminish exposure and attention regarding sexual abuse within the Church;

d.  Whether The USCCB intentionally relocated all known predatory priests;

e.  Whether The USCCB did actively hide from parishioners that the priests accused of sexual abuse presented a real and credible threat of sexual misconduct to the young children within the parish;

f.  Whether The USCCB took any action to ensure safeguards or measures protecting young children from the priests who were known child molesters;

g.  Whether The USCCB actively engaged to protect the assets of Roman Catholic Church by lying to class members about their collective knowledge of child rapist priests; and

h.  Whether The USCCB did actively take steps to conceal abuse by clergy.

73.    Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to liability, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

74.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, and who have expertise in prosecuting personal injury, sexual abuse, and civil rights cases on behalf of vulnerable victims.

75.    Plaintiffs and counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and they have the financial resources and experience in handling sex abuse cases to do so.

76.    Neither Plaintiffs nor counsel have any interests adverse to those of the other members of the Classes.

77.    Plaintiffs and the Class will have personal injury damages that are individualized, depending on the severity of the abuse and the resulting psychological trauma, but those can be managed separately.

## VI.    CAUSES OF ACTION

### Count I: Breach of Fiduciary Duty

78.    Plaintiffs incorporate the foregoing paragraphs as though fully reproduced herein.

79.    Plaintiffs and their families reasonably relied on The USCCB to protect them from an unreasonable risk of harm of sexual abuse, as The USCCB was the entity tasked with authoring policy and procedure for the Catholic Church in the U.S., and as such, a fiduciary relationship existed.

80.    The USCCB proclaims itself as being the national governing body and, thus, it assumed a fiduciary responsibility and duty to Catholics. Plaintiffs and the class members, as Catholics, acted in reliance on this relationship and in the belief that The USCCB was doing God's work and protecting them from evil.

81.    Plaintiffs and class members would never have entrusted themselves or been exposed to the pedophile priests had The USCCB not facilitated the religious, Catholic church relationship and propagated the false belief that God was protecting them. Thus, by publicly promising the protection of God to plaintiffs and the class members, The USCCB further assumed a fiduciary duty to protect the plaintiffs and class members.

82.    The minor age of the class members at the time this abuse happened heightens the duties owed by the USCCB because these minors were not capable of protecting themselves and relied even more on the power and religious benevolence of The USCCB to protect them from the sexual abuse, rape, molestation they suffered.

83.    The USCCB breached its fiduciary duties to Plaintiffs by intentionally, knowingly, and/or recklessly failing to exercise the highest degree of care (or any degree of care at all) to create, promulgate, or enact a policy or procedure regarding sexual abuse by clergy.

84.    If The USCCB had acted four decades ago to create the Charter, or any document of the like, which required Dioceses to investigate sexual abuse and take proper action against abuser priests, Plaintiffs would have never been harmed.

85.    Due to the lack of any policy within the Church to take swift and punitive measures against clergy who abused children, priests were emboldened and given unfettered access to children.

86.    As a direct and proximate result of the negligent actions and inactions of The USCCB, Plaintiffs have suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

87.    Plaintiffs claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## Count II: Negligence

88.    Plaintiffs incorporate the foregoing paragraphs as though fully reproduced herein.

89.    At all relevant times, The USCCB had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiffs.

90.    At all relevant times, The USCCB had a duty to exercise reasonable care to avoid creating or maintaining unreasonable risks to the safety and welfare of their young parishioners, including Plaintiffs.

91.    At all relevant times, The USCCB had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law against their young parishioners, including Plaintiffs.

92.    This duty existed because of the monetary tithing paid by Catholic parishioners throughout the Archdiocese of New York, which The USCCB accepted to fund its own initiatives.

93.    A duty of care existed because The USCCB assumed the duty by voluntarily acting to induce the belief that it was protecting the Catholic parishioners from harm.

94.    A duty of care existed because The USCCB ratified the actions of the pedophile priests by shuffling them around the country to help them evade detection. By doing so, The USCCB furthered the abuse and helped ensure that the pedophile priests could continue to prey on young victims.

95.    The USCCB breached its duty of care by acting with reckless disregard of the safety and welfare of Plaintiffs and other innocent children by failing to take any action to stop sexual abuse by clergy until at least 2002, long after Plaintiffs were abused. Even then, in 2002, the actions taken by The USCCB were token efforts that did not stop the abuse.

96.    As a direct and proximate result of the negligent actions and inactions of The USCCB, Plaintiffs have suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue to accrue and deepen.

97.    Plaintiffs claim damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### Count III: Gross Negligence

98.    Plaintiffs incorporate the foregoing paragraphs as though fully reproduced herein.

99.    At all relevant times, The USCCB had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiffs.

100.    At all relevant times, The USCCB had a duty to exercise reasonable care to avoid creating or maintaining unreasonable risks to the safety and welfare of their young parishioners, including Plaintiffs.

101.    At all relevant times, The USCCB had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law against their young parishioners, including Plaintiffs.

102.    This duty existed because of the monetary tithing paid by Catholic parishioners throughout the Archdiocese of New York, which The USCCB accepted to fund its own initiatives.

103.    The USCCB breached its duty of care by acting with reckless disregard of the safety and welfare of Plaintiffs and other innocent children by failing to take any action to stop sexual abuse by clergy until at least 2002, long after Plaintiffs were abused.

104.    More concerned with the reputation of the Church and diminishing attention regarding sexual abuse by clergy, The USCCB actively chose to avoid creating "legislation" that would seek to protect innocent Catholic Children.

105.    Engaging in conduct that was wanton and willful, recklessly and in conscious disregard of the safety of innocent children parishioners, including Plaintiffs, The USCCB was grossly negligent in breaching these duties.

106.    As a direct and proximate result of the negligent actions and inactions of The USCCB, Plaintiffs have suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

107.    Plaintiffs claim damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### Count IV: Aiding and Abetting (Vicarious Liability)

108.    Plaintiffs incorporate the foregoing paragraphs as though fully reproduced herein.

109.    At all relevant times, The USCCB had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiffs.

110.    Because The USCCB turned a blind-eye to clergy sexual abuse of Plaintiffs instead of seeking to protect and shelter innocent children, The USCCB effectively aided and abetted the assaults by Fathers Sewall, Casey and hundreds of other predatory priests.

111.    From at least 1966 to 2002, The USCCB did know that its failure to act to stop child molestation by clergy was permissively giving the clergy free reign to abuse children without repercussion.

112.    The USCCB's actions and inactions did allow these priests access to children and bestowed upon them the authority perpetuate acts of sexual abuse.

113.    The USCCB provided substantial assistance to these clergymen by: failing to enact policies which required the Diocese to investigate all reports of sexual misconduct, by failing to mandate that all Diocese reports of sexual misconduct of children be reported to law enforcement, by failing to report child sexual abuser clergy to law enforcement, and by failing to promulgate any information to parishioners about the potential dangers posed by clergy who had previously sexually abused children.

114.    The USCCB's actions were deliberate and intentional, in an attempt to thwart all negative attention on the Church, which might diminish parishioners' donations and the amount of money they were willing to give the Church and effectively The USCCB.

115.    Not only did The USCCB fail to prevent sexual abuse by clergy, but it created an environment within the Archdiocese of New York in which all children were vulnerable to injury.

116.    As a direct and proximate result of the negligent actions and inactions of The USCCB, Plaintiffs have suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

117.    Plaintiffs claim damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs and the putative class are entitled to and hereby demand a jury trial in this matter.

## VIII.   PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court will:

A.    Enter judgment against Defendant in such amount as will fully and adequately compensate Plaintiffs for the damages suffered, in an amount to be determined at trial;

B.    Award Plaintiffs punitive damages against Defendant in an amount to be determined at trial;

C.    Award Plaintiffs pre- and post-judgment interest;

D.    Award Plaintiffs actual expenses of litigation, including reasonable attorneys' fees;

E.      Award Plaintiffs injunctive relief that requires The USCCB to put in place (and fund) supervision and compliance protocols that actually prevent, uncover, and stop the sexual abuse of parishioners;

F.      Appoint Plaintiffs as class representative;

G.      Certify the class described above;

H.      Appoint Plaintiffs' counsel as counsel for the class; and

I.      Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ *Rex A. Sharp*

Rex A. Sharp, NDNY # 700808
Ryan C. Hudson, NDNY # 700804
Larkin Walsh, NDNY # 700802
Sarah T. Bradshaw, NDNY # 700803
REX. A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
rsharp@midwest-law.com
rhudson@midwest-law.com
lwalsh@midwest-law.com
sbradshaw@midwest-law.com

**Attorneys for Plaintiffs and Putative Class**